**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 12-cv-2021-WJM-CBS

RONALD MUKASA MAITEKI,

      Plaintiff,

v.

MARTEN TRANSPORT LTD, and
VOYAGER EXPRESS INC.,

      Defendants.

---

**ORDER GRANTING MARTEN'S MOTION FOR SUMMARY JUDGMENT, GRANTING
IN PART AND DENYING IN PART VOYAGER'S MOTION FOR SUMMARY
JUDGMENT, AND DENYING AS MOOT MAITEKI'S MOTION TO STRIKE**

---

Plaintiff Ronald Maiteki ("Maiteki") sues Defendant Marten Transport Ltd.

("Marten") and Defendant Voyager Express Inc. ("Voyager") for alleged violations of the

Fair Credit Reporting Act ("FCRA") and related claims.  (ECF No. 157.)  Currently

before the Court are three motions: Marten's Motion for Summary Judgment (ECF No.

220), Voyager's Motion for Summary Judgment (ECF No. 221), and Maiteki's Motion to

Strike or for Leave to File a Surreply (ECF No. 239).  For the reasons explained below,

the Court will grant Marten's motion in full, grant Voyager's motion as to all claims

except an alleged violation of 15 U.S.C. § 1681b(b)(3)(A), and deny Maiteki's motion as

moot.

## I.  FACTS: MARTEN

### A.  Admittedly Undisputed Facts

Both sides agree that the following facts are undisputed.

Marten is a trucking company.  (ECF No. 220 at 4, ¶ 1.)[1]  When trucking companies consider hiring a new driver, they frequently request a "Drive-A-Check" report from HireRight.  (*Id.* at 4–5, ¶¶ 3–4.)  HireRight is a data aggregator similar to a credit bureau, and its Drive-A-Check reports are akin to credit reports, except that they focus on a commercial vehicle operator's driving safety record.  (*Id.* ¶¶ 2–3.)[2]

Marten employed Maiteki as an over-the-road truck driver from March to December 2011.  (*Id.* at 5, ¶ 5.)  Shortly after Maiteki resigned, Marten reported his employment history to HireRight, as it was required to do by contract.  (*Id.* at 8, ¶¶ 19–20.)  Among other things, Marten reported an "Unsatisfactory Safety Record."  (ECF No. 1 at 31.)

Maiteki claims that he was denied several job opportunities based on Marten's contribution to his Drive-A-Check report.  (ECF No. 157 at 32, ¶¶ 160–62.)  He therefore filed a dispute with HireRight on March 7, 2012.  (*Id.* ¶ 163.)

By letter dated March 8, 2012, HireRight informed Marten that Maiteki was challenging Marten's report.  (ECF No. 220-11 at 1.)  In relevant part, the letter stated:

> The Fair Credit Reporting Act . . . requires a reinvestigation of an employment history provided for your company [regarding Maiteki].
>
> * * *
>
> **Consumer states that "Unsatisfactory Safety Record" on**

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination.

[2] Drive-A-Check reports are treated as credit reports for FCRA purposes and motor carriers furnishing information for such reports are subject to FRCA under the enforcement authority of the Surface Transportation Board.  *See* 15 U.S.C. § 1681s(b)(1)(C).

> **the work record is incorrect due to the consumer has
> [*sic*] no accidents/incidents listed on the report.**
>
> **HireRight requests Marten send in details/documents to
> support the disputed information.**
>
> Please check your records to determine if an error has been
> made on the information. . . .
>
> * * *
>
> Your response date: 4/6/2012

(*Id.* (formatting in original).)

By letter dated March 22, 2012, Marten employee Ann Konsela responded to

HireRight (in relevant part) as follows:

> I have reviewed Mr. Maiteki's record and conclude the
> information is correct.
>
> On 7/21/2011 Mr. Maiteki was placed on a Written Warning
> due to a speeding citation issued in the State of Illinois on
> 7/16/2011.
>
> On 10/5/2011 a Serious Warning was issued based on
> numerous recorded speed incidents where Mr. Maiteki was
> driving over the posted speed limit.
>
> Therefore, Work Record (938) Unsatisfactory Safety Record
> is accurate.

(ECF No. 220-12.)

## B.     The Illinois Citation & the Warning Letter

Maiteki claims that Marten's reinvestigation was inadequate and that the details

reported in Konsela's March 22, 2012 letter were false.  (ECF No. 229 at 19, ¶ 38.)  The

Court will discuss this claim as it relates to the Illinois citation in this Part, and will

discuss the "numerous recorded speed incidents" below in Part I.C.

Maiteki challenges the Illinois citations on numerous grounds.  As explained below, however, none of these challenges establish a genuine factual dispute over the existence or nature of this Illinois speeding incident, nor a genuine factual dispute over whether Konsela considered this incident as part of her reinvestigation.

    1.    The Illinois Citation

Konsela says that the HireRight dispute letter prompted her to inspect Maiteki's driving record with Marten, which included a "Driver/Vehicle Examination Report" from the Commercial Vehicle Section of the Illinois State Police.  (ECF No. 220 at 10 ¶ 32; *see also* ECF No. 220-8 at 1.)  Under the heading "Violations," the report lists "Speeding 6 to 10 miles per hour over the speed limit."  (ECF No. 220-8 at 1.)  The report's source for that violation was "Citation #WW6799614."  (*Id.*)

Also in the Maiteki's file was the citation itself, an Illinois State Police "Stop Card and Written Warning," with the serial number of 6799614 at the top.  (*Id.* at 2.)  The stop card, dated July 16, 2011, contains an "X" in the box next to "Speeding ___ MPH in a ___ MPH Zone," but the blanks are not filled in.  (*Id.*)

Maiteki disputes that he was cited for speeding on this occasion "because when he was inspected by Illinois State Police, a usual routine examination, his truck was parked, [and] all he received was a stop card which did not show him as having been speeding between six (6) and ten (10) miles."  (ECF No. 229 at 5–6, ¶ 11.)  This is more of an evasion than a dispute.  Maiteki's explanation implicitly admits that the Illinois State Police indeed stopped him on this occasion.  Moreover, the fact that "his truck was parked" is irrelevant—police officers do not issue citations on the fly.  Finally, the fact that the patrol officer did not fill in the blanks for the actual miles-per-hour figures

4

does not alter the fact that the officer put an "X" in the box next to "Speeding" and that Maiteki's official driving record specifies the miles-per-hour figures.

Maiteki also challenges this speeding citation because, he says, "Wendy, Sobotta, [Marten's] Fleet Manager[,] admitted that Maiteki never had any speeding citations or incidents," citing to certain deposition testimony.  (ECF No. 229 at 5–6, ¶ 11.)  Maiteki misrepresents the deposition testimony, which was as follows:

> Q.    Okay.  Did Mr. Maiteki have any citations, speeding citations?
>
> A.    Not that I'm aware of.
>
> Q.    Okay.  So you didn't look at any citations—okay, there were no citations, like you said?
>
> A.    Not that I'm aware of.

(ECF No. 232-7 at 16.)  The fact that Sobotta was not aware of any speeding citations is not an admission by Marten that Maiteki had no speeding citations.

Maiteki also asserts that "Marten never investigated this incident at all because Marten[,] as a policy[,] does not investigate such incidents or use it [*sic*] to discipline drivers."  (ECF No. 229 at 5–6, ¶ 11.)  In support, Maiteki cites an interrogatory in which he asked Marten to describe its "policies and procedures related to investigating transportation incidents."  Marten responded, in pertinent part,

> Generally speaking, Marten does not conduct internal investigations relating to incidents in which a driver was determined to be violating an applicable speed limit or one or more other traffic laws.  However, any driver who receives a moving violation in the course of his [or her] employment may contest that violation through the judicial system of the state in which he or she received the citation.  In the event that a driver successfully contests such a violation through the judicial system, Marten will remove any negative

5

reference relating thereto from the driver's employment
driving history.

(ECF No. 230-4 at 3.)  This does not support an assertion that "Marten never

investigated this incident at all because Marten[,] as a policy[,] does not investigate

such incidents or use it [*sic*] to discipline drivers."  (ECF No. 229 at 5–6, ¶ 11.)  Also,

whether Marten investigated this incident, as a matter of policy or otherwise, is

immaterial to whether the incident occurred.

Given the foregoing, Maiteki has failed to establish a genuine dispute that he

was cited for speeding in Illinois in July 2011.  Furthermore, Maiteki does not dispute

that Marten's driving record for Maiteki contained the documentary evidence of that

citation.  (*Compare* ECF No. 220 at 6, ¶ 11 *with* ECF No. 229 at 5, ¶ 11.)

Maiteki, however, does dispute that Konsela actually looked at the documentary

evidence during her reinvestigation.  (ECF No. 229 at 17, ¶ 32.)  In support, Maiteki

cites an e-mail between Konsela and Sobotta, as well as Marten's responses to certain

requests for admission.  (*Id.*)  These materials relate solely to an October 2011 "serious

warning," discussed below at Part I.C, allegedly issued to Maiteki on account of later

speeding incidents.  They are not relevant to whether Konsela viewed the Illinois driver

report or stop card.  Consequently, Maiteki has failed to establish a genuine dispute

that Konsela actually looked at those documents as part of the reinvestigation.

2.    The Warning Letter

As part of the reinvestigation, Konsela says she also looked at a July 21, 2011

warning letter from a Maiteki supervisor to Maiteki, which reads in relevant part

(somewhat ungrammatically) as follows: "Due to the violation of company policy

regarding, neglecting job duties and responsibilities and FMCSR 392.25[3] regarding recent speeding violation, [Marten] is placing you on a **Warning**.  The Warning will be in place for six months."  (ECF No. 220-9 at 1 (boldface in original).)

Maiteki disputes that his driving record contains this warning letter.  In support, he argues that "Marten never investigates or disciplines its drivers for such incidents," citing the same interrogatory response quoted above.  (ECF No. 229 at 6, ¶ 12.)  That response only states that Marten, "[g]enerally speaking, . . . does not conduct internal investigations" into speeding incidents.  (ECF No. 230-4 at 3.)  It does not say that Marten never disciplines its drivers for speeding.

Maiteki also cites the Sobotta deposition testimony about her unawareness of any speeding citations for Maiteki.  (ECF No. 229 at 6, ¶ 12.)  As already explained, that testimony does not undermine the existence of the speeding citation, and has no relevance to whether Marten issued a warning letter in response to the citation.

Thus, Maiteki has not established a genuine dispute about the existence of the warning letter.  He nonetheless disputes whether Konsela ever looked at it during her reinvestigation, citing an e-mail from Konsela to Sobotta and a response to a request for admission regarding that e-mail.  (*Id.* at 17, ¶ 32.)  As already noted, this evidence pertains to a different warning, one given in October 2011 allegedly in response to additional speeding incidents.  This evidence says nothing about the July 2011 warning

---

³ This presumably refers to 49 C.F.R. § 392.25, a regulation promulgated by the Federal Motor Carrier Safety Administration.  The regulation prohibits "the use of any flame-producing emergency signal for protecting any commercial motor vehicle transporting" certain explosive and flammable cargo.  Marten nowhere explains this alleged violation and does not rely upon it as a justification for reporting an unsatisfactory safety record to HireRight.

letter.  Thus, Maiteki has failed to establish a genuine dispute that Konsela viewed the July 2011 warning letter as part of the reinvestigation.

## C.    Additional Speeding Incidents

In addition to the Illinois speeding incident, Konsela's response letter to HireRight justified Marten's adverse safety report because a "Serious Warning was issued based on numerous recorded speed incidents where Mr. Maiteki was driving over the posted speed limit."  (ECF No. 220-12.)  As with the Illinois citation, Maiteki challenges this assertion on numerous grounds, and his Motion to Strike specifically relates to certain evidence Marten offers in its reply brief to bolster the assertion.  As the following analysis demonstrates, however, Maiteki has failed to raise a genuine issue of material fact as to these additional incidents.  This is so even without considering the evidence Maiteki seeks to strike (*see* ECF No. 239), which the Court has not considered and will not discuss below.

### 1.    Marten's Story

Marten says that the "numerous recorded speed incidents where Mr. Maiteki was driving over the posted speed limit" were documented through information provided by a company named SpeedGauge, Inc.  (ECF No. 220 at 5, ¶ 6.)  Maiteki argues that "SpeedGauge is a recent façade of Marten's imagination."  (ECF No. 229 at 4, ¶ 8.)  Determining whether this presents a genuine factual dispute requires an extended discussion of SpeedGauge, its alleged use at Marten, and Marten's record-keeping procedures with respect to it.

SpeedGauge is the name of a company, and it is also the name by which Marten referred to the company's service, *i.e.*, a system by which speedometer readings are

8

correlated with posted speed limits and then sent to Marten for review.  (ECF No. 220-3 at 2–3; ECF No. 245-6 at 3–4.)  Marten claims that it began using SpeedGauge in December 2010.  (ECF No. 220 at 5, ¶ 6.)  Marten further claims that it would "address the matter directly" with any driver shown "to have traveled at speeds significantly in excess of posted speed limits," and would also "place an entry regarding [such] incidents in a Human Resources Image Screen ('HRIS') record."  (*Id.* at 5–6, ¶ 8.)

Marten's HRIS record for Maiteki contains an entry made by "WLS" on October 5, 2011.  (ECF No. 220-7 at 2.)  Sobotta testified at her deposition that her initials are WLS and that she made the October 5 entry.  (ECF No. 220-5 at 7.)  The October 5 entry is categorized as "WARNING(SERIOUS)," and the narrative portion states that SpeedGauge had logged Maiteki driving 12 miles per hour over the speed limit in Connecticut.  (ECF No. 220-7 at 2.)  The narrative continues, "Told him date and place[.]  He said they didn[']t go that fast.  The point is we told him to slow down but 13 incidents in 7[ ]days."  (*Id.* (capitalization normalized).)  Marten claims that these thirteen incidents in seven days referred to thirteen incidents of driving four or more miles per hour over the posted speed limit.  (ECF No. 220 at 6–7, ¶ 13; ECF No. 220-5 at 3.)  Konsela says that this HRIS entry was the basis for her statement in her response letter to HireRight that a "Serious Warning was issued based on numerous recorded speed incidents where Mr. Maiteki was driving over the posted speed limit." (ECF No. 220-12.)

2.    Maiteki's Response

Maiteki attacks most aspects of Marten's story, essentially accusing Marten of fabricating it.  The Court will address all attacks in turn.

9

a.    *Reliability of HRIS Records*

In various forms, Maiteki objects that the original SpeedGauge records no longer

exist.  (*See, e.g.*, ECF No. 229 at 4–13, ¶¶ 8, 13, 16, 22, 27.)  Marten admits as much,

asserting that it "does not keep speed-monitoring data pertaining to a driver after he or

she separates from the Company."  (ECF No. 220-6 ¶ 14 n.1.)  Marten also ended its

relationship with SpeedGauge at some point after Maiteki's departure.  (ECF No. 220 at

11, ¶ 36.)  Nonetheless, Sobotta testified that she created the HRIS entry on October 5,

2011, drawing on contemporaneous SpeedGauge reports.  (ECF No. 220-5 at 2, 7–8.)

Maiteki does not object that the HRIS entry is inadmissible (*e.g.*, as failing to meet the

requirements of the business records hearsay exception, Fed. R. Evid. 803(6)).  Thus,

competent evidence exists to show that the SpeedGauge reports were real and

contained the information noted by Sobotta on the October 5, 2011 HRIS entry.

Maiteki persists, however, that "Marten has a practice and pattern of falsifying

incidents [it] put[s] on [its] internal records for drivers."  (ECF No. 229 at 7–8, ¶ 16.)  In

support, Maiteki cites information obtained from a FOIA request to the Federal Trade

Commission (FTC).  (ECF No. 230-7.)  Maiteki requested "all investigative and

consumer complaints regarding Marten," and FTC sent back the record of a single

complaint from 2007 or 2008, accusing Marten of

> reporting inaccurate information on the consumer[']s work
> history report.  The consumer states that the company is
> reporting that the consumer struck another employee with
> her tractor trailer, and the consumer states that she didn't.
> The consumer has documentation from a judge stating a
> ruling in her favor, but the company will not remove it.

(*Id.* at 1, 2.)  "However," the FTC said, "we were not able to locate any investigative

10

records [relating to this complaint]." (*Id.* at 1.) This information falls well short of raising

a triable issue of fact whether Marten regularly falsifies data on its drivers' employment

records.

Marten further asserts that "Marten's HRIS portal is severely error prone." (ECF

No. 229 at 10–11, ¶ 22.) In support, Maiteki cites some fairly opaque testimony from

Konsela's deposition:

> Q. You understand what a Drive-a-Check report is?
>
> A. Yes.
>
> Q. Okay. Do you understand what DOT recordable accidents are?
>
> A. Yes.
>
> Q. Do you understand what non-DOT recordable accidents are?
>
> A. Yes.
>
> Q. Why weren't the accidents that were in the [HRIS] file inserted into the [Drive-A-Check] report as a DOT or non-DOT recordable accident?
>
> A. If it was an incident, it was not reported.
>
> Q. Are you suggesting that it's an incident and not an accident, even—
>
> A. Possibly.
>
> Q. —though the HRIS file says preventable accidents?
>
> So the HRIS file is in error, it's—it's an erroneous document?
>
> [Form objection.]
>
> Q. The HRIS file has issues with the language?

[Form objection.]

A.      Yes.

(ECF No. 232-5 at 14–15.)[4]  Maiteki provides no context for this exchange—the deposition transcript pages leading up to it are not in the record.  As best the Court can discern, Maiteki's counsel and Konsela are discussing whether the HRIS's input fields correspond to certain DOT categories.  Or perhaps they are discussing whether Marten, when reporting information for Drive-A-Check purposes, properly reports on certain types of accidents.  In any event, nothing here suggests that "Marten's HRIS portal is severely error prone."  (ECF No. 229 at 10–11, ¶ 22.)

Similar to the foregoing, Maiteki further asserts that "Konsela testified that she has had to make corrections and clarifications [to Marten's records] on several [reinvestigation] occasions," but by way of example, Maiteki states only that "[t]here are often errors in descriptions of accidents that [Konsela] has encountered."  (ECF No. 229 at 29.)  In support, he cites the following deposition excerpt:

> Q.      And what's the result usually [of a reinvestigation]?  Is what you have on file accurate?  Have you ever corrected any inaccuracies—
>
> A.      With HireRight?
>
> Q.      —based on your experience?
>
> A.      If new information comes to light, yes, there's been clarifications.
>
> Q.      Okay.

---

[4] Maiteki also cites another passage of deposition testimony, but it has no discernible relevance to the reliability of the HRIS system.  (*See* ECF No. 232-5 at 12:7–10.)

> A.   There—there could possibly be descriptions.  I see
> that more in accident descriptions of an accident that
> have been corrected or adjusted.

(ECF No. 232-6 at 4–5.)  This testimony does not support an assertion that "Konsela

testified that she has had to make corrections and clarifications on several occasions."

It says nothing about the quantity of corrections, only that when corrections happen,

they are usually to accident descriptions.  This is, at best, only a scintilla of evidence

that the negative information in Maiteki's record (which was not accident-related) was

entered in error.  It does not create a genuine factual dispute.  *See Adler v. Wal-Mart*

*Stores, Inc.*, 144 F.3d 664, 678 n.5 (10th Cir. 1998) ("Genuine issues of fact must be

supported by more than a mere scintilla of evidence.").

### b.   *The Konsela-Sobotta E-mail Exchange*

Closely related to the foregoing, Maiteki makes much of an e-mail exchange

between Konsela and Sobotta on March 22, 2012.  (*See, e.g.*, ECF No. 229 at 7, ¶ 15.)

That e-mail exchange began with Konsela emailing Sobotta at 11:07 a.m., stating as

follows:

> Wendy,
>
> I am responding to a [Drive-A-Check] Rebuttal [from Maiteki]
> and need your help.
>
> Could you look at the HRIS Comment you added to this
> driver's file on 10/5/11?  I do not find where a Serious
> Warning letter was ever written—[neither] Alexa nor I have
> an email from you asking for a letter on this driver and the
> comments added do not match the Driver Review Que[ue].
> I do not find 13 incidents in 7 days prior to 10/5/11 or that he
> was in [Connecticut] gauged at 12 mph over.  But let me
> know if I am not [*sic*]
>
> Could have this [*sic*] comment been entered under this

> driver in error?  I would like to remove it if you agree or
> would you have an e-mail from 10/5/11 to Stacy Gray, Alexa
> for myself regarding this driver?
>
> Let me know what you think.

(ECF No. 230-1 at 1–2.)  At 11:14 a.m., Sobotta responded (quoting verbatim), "No it

his sorry not sure why u didn't get the info on it? so now what?"  (*Id.* at 1.)  The next

entry on the e-mail chain comes from 11:44 a.m., where Konsela says to Sobotta,

"Thanks for the quick school on the Driver Review Queue," to which Sobotta replies,

"No problem sorry on the letter thing."  (*Id.*)

Both Konsela and Sobotta testified at their depositions that they spoke on the

phone in the gap between the 11:14 and 11:44 e-mails.  Konsela testified that she

learned from Sobotta about how SpeedGauge worked, and that Sobotta confirmed the

accuracy of her HRIS entry—apparently from memory, because the underlying

SpeedGauge records no longer existed.  (ECF No. 232-5 at 4–5.)  Sobotta recalled

explaining the SpeedGauge system to Konsela.  (ECF No. 220-5 at 3; *see also id.* at

7–8; ECF No. 232-7 at 22–23.)  Thus, as it relates to SpeedGauge, the Konsela-

Sobotta e-mail exchange is simply additional evidence that SpeedGauge records no

longer existed to backup Sobotta's HRIS entry.  It is not evidence of fabrication.

Maiteki also makes much of the fact that Konsela could not find a letter

documenting the Serious Warning.  (ECF No. 229 at 7–8, ¶ 16.)  Maiteki appears to

assume that the Serious Warning should have generated a letter, but the relevant HRIS

entry documents a conversation.  It does not mention a written warning—in contrast to

the HRIS entry for July 21, 2011, documenting Maiteki's Illinois speeding citation.  (*See*

14

ECF No. 220-7 at 2.)[5]  Thus, Konsela's e-mail exchange with Sobotta does not raise a genuine dispute of fact regarding the existence of SpeedGauge data generally or specifically as to Maiteki.

      c.    *Ability to Request SpeedGauge Data*

Maiteki claims that "Marten testified that 'SpeedGauge' speeding data concerning Maiteki can still be accessed today," hoping to create an inference that Marten's failure to access it and produce it in this lawsuit shows that it is hiding something, or at least that its investigation was unreasonable for failure to check the original data.  (ECF No. 229 at 18, ¶ 36.)  Maiteki relies on the following excerpt from Konsela's deposition:

Q.    Okay.  So Marten enacted a SpeedGauge from in trucks?

A.    It's a report.

Q.    It's a report.  The gauge is a report or the gauge is— Marten enacted a SpeedGauge after this—can you clarify what you just said?  I don't understand what you said, I'm sorry.

A.    Marten Transport put a program together to be able to manage—to be able to view speed of trucks in given areas, any area, in an effort to be able to, you know, identify, counsel, advise drivers of speed.

Q.    Do they—do you still use the gauge today?

A.    We still have access to it, yes.

Q.    You still have access to SpeedGauge?

---

[5] As for the "driver review queue" mentioned in the e-mail exchange, the parties do not elaborate on it or its significance.

> A.    Yes.

(ECF No. 232-5 at 7.)  But this deposition exchange continues, including on to the next page of the deposition transcript, which Maiteki omitted from his summary judgment papers but Marten has supplied:

> Q.    Okay.  Can I go back to the letter, Exhibit 1?  Let me go back for a second.
>
>         If—are you able to access that—the SpeedGauge today?
>
> A.    Yes.  Could I clarify, though?  SpeedGauge was a name of a company.
>
> Q.    Okay.
>
> A.    SpeedGauge is what employees of Marten Transport refer to when they're speaking of the speed of the truck, of a driver.
>
> Q.    And you can still access it today?
>
> A.    Yes.

(ECF No. 220-3 at 2–3.)  Viewing the entire passage, it is clear that Konsela testified that Marten still tracks driver speed, not that it has access to historical information from the company named SpeedGauge.  Thus, contrary to Maiteki's assertion, Marten has never admitted that it has continuing access to historical SpeedGauge data.

> d.    *Ability to Subpoena SpeedGauge*

Similar to the foregoing argument, Maiteki draws an inference from the fact that Marten never, as part of this lawsuit, subpoenaed Maiteki's driving information from SpeedGauge.  (ECF No. 229 at 18, ¶ 36.)  Marten retorts that Maiteki, "who has the burden of proof in this matter, could have subpoenaed records from SpeedGauge but

16

apparently found it unnecessary to do so." (ECF No. 236 at 7, ¶ 36.)

Regardless of who bears the burden, a jury in a civil case may usually draw inferences against a defendant for failing to offer evidence in its own defense. Marten's failure to subpoena Maiteki's SpeedGauge records—assuming they still exist (something no party addresses)—could therefore be the basis of a jury's adverse inference.

Even so, the range of permissible inferences would be limited. Maiteki's two remaining claims against Marten are for unreasonable reinvestigation under FRCA and for defamation. (*See* Part II, *infra*.) There could be no relevant adverse inference concerning the FCRA unreasonable investigation claim because the failure to subpoena SpeedGauge records in this lawsuit has nothing to do with whether Marten failed to reasonably investigate in March 2012.

As for the defamation claim, SpeedGauge records could help to prove that the supposedly defamatory statement was true, and Marten's failure to obtain those records could support an inference that Marten is at least uncertain what it would find, in turn supporting an inference that the alleged defamatory statement was false (or at least that Marten was reckless about its truth or falsity). In the context of the evidence as a whole, however, this would at best rise to the level of a "mere scintilla," which is not enough to defeat summary judgment. *See Adler*, 144 F.3d at 678 n.5. Consequently, the lack of a subpoena from Marten to SpeedGauge does not create a triable issue of fact.

  e. *Marten Company Policy*

In a further attempt to raise a triable dispute about whether Marten ever used

SpeedGauge, Maiteki claims "[i]t is undisputed that Marten as a Company policy does not use or even condone the use of Speed tracking-technology," citing testimony from the Sobotta deposition. (ECF No. 229 at 4–5, ¶ 8.) This again misrepresents deposition testimony. Referring to "The Official Guidebook of the Marten Driver," counsel for Maiteki read the following passage to Sobotta: "Marten Transport complies with all state and federal laws and DOT requirements. Marten Transport does not condone the use of . . . radar detectors, laser detectors, scanners, or police receivers." (ECF No. 232-7 at 8.) Counsel then engaged Sobotta in the following exchange:

> Q.    . . . Would you consider the SpeedGauge a radar detector?
>
> A.    No.
>
> Q.    Would you consider it a scanner?
>
> A.    No.
>
> Q.    You wouldn't. But does it do the same function as a—
>
> A.    It was used as a safety tool, not as—not as one of these devices.
>
> Q.    Okay. But they—they do the same thing, right? They gauge speed?
>
> A.    Correct.
>
> Q.    So the result is the same, but the purpose for which you're employing them is different, correct?
>
> A.    Correct.
>
> Q.    Okay. But you understand that Marten Transport says they do not condone—condone the use of radar detectors?

A.     Right.

Q.     So most likely they wouldn't agree to use a radar detectors [*sic*]?

A.     Right.

Q.     But they would agree to the use of SpeedGauge— SpeedGauge in the trucks?

A.     Yes, I answered.

(*Id.* at 8–9.)  Thus, Marten disapproves of radar detectors, laser detectors, scanners, and police receivers.  But Maiteki points to nothing in the Official Guidebook or elsewhere stating that Marten disapproves of "Speed tracking-technology"—a category that Maiteki's counsel appears to have invented during the deposition (*i.e.*, devices that "gauge speed") in hopes of leading Sobotta into some sort of admission that SpeedGauge would be contrary to company policy.

Counsel obtained no such admission, obviously.  Counsel therefore had no good faith basis to represent to this Court "that Marten as a Company policy does not use or even condone the use of Speed tracking-technology."  (ECF No. 229 at 4–5, ¶ 8.) Indeed, the word choice demonstrates an attempt to be technically true (because Marten does not condone "Speed tracking-technology," *if* that refers to technology such as radar detectors) but intentionally misleading (because "Speed tracking-technology," on its face, appears to be a category that would encompass SpeedGauge, although, for Marten, it does not).

f.     *Speed Governors on Marten Trucks*

Maiteki additionally claims that "[a] Marten vehicle cannot speed past the posted speed limit anywhere," citing testimony from his own deposition.  (ECF No. 229 at 6–7,

¶ 14.)  But that is not what Maiteki stated in his deposition.  Rather, he testified that Marten's "vehicles are governed, so there is no way a driver can speed in an area which has a speed limit which is over the speed—the governed speed limit."  (ECF No. 232-4 at 4.)  Thus, Maiteki's counsel cannot truthfully represent that "[a] Marten vehicle cannot speed past the posted speed limit *anywhere*" (emphasis added).  At best, a Marten vehicle cannot speed in an area where the posted speed limit matches the governor's speed limit.[6]  This fails to raise a genuine dispute about the existence of SpeedGauge.

**D.**     **Summary**

Having reviewed the evidence thoroughly, the Court concludes that Maiteki fails to raise any genuine dispute of material fact regarding the information backing up Konsela's March 22, 2012 response letter to HireRight.

## II.  ANALYSIS: MARTEN

**A.**     **Claim 7: Unreasonable Investigation (FCRA)**

1.     Reasonable Investigation Standard

Under FCRA, when a furnisher of credit information is notified by a credit reporting agency that the accuracy of information it supplied has been contested, the furnisher is required to

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer

---

[6] Marten claims that its trucks are governed at 65 mph, and that limit can be surpassed on a sharp descending grade.  (ECF No. 236 at 4, ¶ 14.)

reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after . . . reinvestigation . . . , for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).  "Courts have implied a reasonableness requirement to this investigation."  *Maiteki v. Marten Transp. Ltd.*, 4 F. Supp. 3d 1249, 1252 (D. Colo. 2013); *see also Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005); *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 426 n.2 (4th Cir. 2004).  Moreover, "the requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate."  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1161 (9th Cir. 2009).  "The burden of showing the investigation was unreasonable is on the plaintiff."  *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010).

2.    Marten's Investigation

Here, it is beyond genuine dispute that:

21

- Marten received HireRight's March 8, 2012 letter conveying Maiteki's complaint that "'Unsatisfactory Safety Record' on the work record is incorrect due to [Maiteki having] no accidents/incidents listed on the report";

- Konsela handled the reinvestigation;

- Konsela consulted at least the HRIS, the otherwise unexplained Driver Review Queue, and the portion of Maiteki's file containing documentation of the Illinois citation;

- Konsela found no documents underlying the HRIS entries regarding speeding, was prepared to delete those entries if not confirmable, and consulted with source of that information—Sobotta—regarding their accuracy;

- Sobotta told Konsela that the HRIS information was correct; and

- Konsela timely wrote back to HireRight with details regarding Maiteki's "Unsatisfactory Safety Record" (*i.e.*, dates and descriptions of the various speeding incidents).

In response, Maiteki asserts no less than twenty reasons why Marten's reinvestigation was unreasonable:

1. "Marten has no written policies and procedures for investigation of disputes and has no plans to draft any at all."

2. "Marten does not review or update its unwritten policies and procedures."

3. "Nonexistence of supervisory oversight or monitoring during investigations."

4.      "Absence of exclusive department or office dedicated to investigating disputes."

5.      "Key employees are not aware about the FCRA accuracy requirements during investigations."

6.      "Failure to set aside a budget to ensure accuracy during investigations."

7.      "Marten's dispute investigation procedure is repeatedly error prone."

8.      "[Lack of] On-the-Job training for employees investigating disputes."

9.      "Lack of official company Policy to train employees on their FCRA duties."

10.     "Key employees lack knowledge about the industry and Marten's coding practices."

11.     "Marten engaged in the infamous data conformity charade without any substantive investigation."

12.     "Marten's investigation of Maiteki's dispute was incomplete."

13.     "Mismatch between Maiteki's actual dispute and what Marten responded [to]."

14.     "Marten cabined the scope of the investigation."

15.     "Marten lacked a legally competent driver qualification file for Maiteki pursuant to FMCSA 49 C.F.R. § 391.51."

16.     "Marten never reviewed alleged third party records."

17.     "The Company never reviewed original account records to verify accuracy."

18.     "Marten has deficient document retention policies."

19.     "Marten Failed to report the results of their investigation."

20.     "Marten failed to 'modify,' 'delete' or 'permanently block the information.'"

(ECF No. 229 at 26–35.)  Many of these arguments overlap, so the Court will address

them below in related blocks.

a.     *General Policy and Procedure*

Arguments 1–4, 6, and 18 accuse Marten of generally failing to have a

sufficiently formal reinvestigation system.  Marten disputes some of these accusations

but the Court finds the dispute immaterial under the circumstances.  Although lack of

formal reinvestigation policies and procedures may have a role in some FCRA disputes,

the Court finds that it has no relevance to the present dispute given the scope of the

reinvestigation required in this case, as discussed in Part II.A.2.d below.

b.     *Employee Training*

Arguments 5 and 8–10 all relate to supposed deficiencies in employee FCRA

training.  The only insufficiently trained employees Maiteki refers to, however, are

Sobotta and another employee named Alexa Sax, who was "involved in generating

disciplinary warnings to drivers."  (ECF No. 229 at 29.)  Maiteki does not attack

Konsela's FCRA training, and Konsela was the investigator in this instance.[7]  To be

sure, Maiteki claims that Konsela was forced to "engage[] in on-the-job training during

the investigation of Maiteki's dispute," but this refers to Konsela's knowledge of how the

Driver Review Queue works (as evidenced by the Konsela-Sobotta e-mail exchange),

not Konsela's knowledge of FCRA requirements.  The fact that Konsela asked for help

with a particular data source shows that she takes her FCRA responsibilities seriously,

---

[7] Konsela testified that she receives ongoing FCRA training and education.  (ECF No. 236-3 at 7–8.)

not that she was insufficiently trained to perform a FCRA investigation.  Thus, these arguments provide no shield against summary judgment.

### c.    *Propensity for Error*

Argument 7 again accuses Marten of having an error-prone record system.  The Court has already found that Maiteki's evidence fails to raise a genuine factual dispute on this matter.  (*See* Part I.C.2.a, *supra*.)

### d.    *Scope of Investigation*

Arguments 11, 13, and 14 accuse Marten of performing a perfunctory investigation.  However, "[t]he wording of the notice of dispute, as the furnisher receives it from the CRA [here, HireRight], constrains the investigation: the furnisher need only respond to the specific dispute, as it is received.  Thus, a limited investigation may suffice for a limited dispute."  *Collins v. BAC Home Loans Servicing LP*, 912 F. Supp. 2d 997, 1011 (D. Colo. 2012) (citations omitted); *see also Chiang*, 595 F.3d at 38 ("a more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute").

In this case, HireRight's March 8, 2012 letter stated that Maiteki disputed the "Unsatisfactory Safety Record" notation on his Drive-A-Check report due to having "no accidents/incidents listed on the report."  (ECF No. 220-11.)  The question for Marten, then, was whether any "accidents/incidents" justified reporting an "Unsatisfactory Safety Record" to HireRight.  Under the circumstances, and particularly considering that HireRight's letter provided only this vague assertion, the Court holds as a matter of law that Marten reasonably limited the scope of its investigation to confirming that its

internal records supported the claim of an "Unsatisfactory Safety Record."[8]

Maiteki nonetheless appears to dispute whether Marten fulfilled its duty to "review all relevant information provided by the consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1)(B). Specifically, Maiteki notes that the March 8, 2012 letter from HireRight to Marten states that it is enclosing "photocopies of the employment history you provided [about Maiteki] and the rebuttal statement provided by [Maiteki]" (ECF No. 220-11), but (a) "Konsela testified that HireRight only sends a standard letter stating what a driver disputes with no mention of attachments," and (b) "Konsela quickly went straight to looking at the computer summary Driver Review Queue and HRIS screen for comments entered on Maiteki." (ECF No. 229 at 16, ¶ 30.)

For reasons that no party explains, the enclosures themselves are not in the record. Regardless, Maiteki's arguments are baseless. The first statement ("Konsela testified that HireRight only sends a standard letter stating what a driver disputes with no mention of attachments.") is worded to convey the impression that Konsela testified to a lack of attachments. She did not. When asked, "[W]hat [does HireRight] send to you in particular?", Konsela responded, "It's a standard letter that would state the driver's name[,] his dates he was employed by Marten, [and] what he disputes." (ECF No. 232-5 at 8 (irrelevant verbal interjection omitted).) This answer responds to a question about HireRight letters generally, not the letter about Maiteki specifically; and

---

[8] Maiteki challenges Marten's assertion that it considers speeding violations to be a violation of company safety standards. (ECF No. 229 at 11, ¶ 24.) "Indeed," says Maiteki, "this is another fantastical notion by Marten." (*Id.*) To the contrary, it would be fantastical if a trucking company such as Marten did not consider speeding to be a violation of its safety standards.

Konsela was never asked about attachments.

As for the second statement ("Konsela quickly went straight to looking at the computer summary Driver Review Queue and HRIS screen for comments entered on Maiteki."), Maiteki cites three items of evidence.  The first is a particular page of Konsela's deposition testimony that Maiteki does not put in the record.  (*See* ECF No. 229 at 16, ¶ 30 (citing "p.20" of ECF No. 232-5, which does not exist).)  The second is to a Konsela deposition excerpt that has no apparent relevance to the issue.  (*Id.* (citing "p.29:19-25" of ECF No. 232-6, which is a discussion of the number of HireRight reinvestigation letters Marten receives every year).)  The third is a *Sobotta* deposition excerpt in which Maiteki's counsel asks a confusing series of questions conflating Sobotta's use of the Driver Review Queue when she is evaluating disciplinary measures and her use of that same data source when asked by Konsela to confirm its accuracy. (*See* ECF No. 232-7 at 12–14.)  This says nothing about whether *Konsela* consulted the enclosures accompanying HireRight's March 8, 2012 letter.

Furthermore, Maiteki has not explained what might have been in those enclosures that would have given Konsela more direction, thereby altering the scope of a reasonable investigation under the circumstances.  For all these reasons, the Court rejects Maiteki's attempt to raise a factual dispute on proper scope of Marten's reinvestigation.

e.   *Completeness of Marten's Reinvestigation*

Arguments 12, 16, and 17 all claim that Marten could not perform a competent investigation without the original records underlying the HRIS speeding notations.  But Marten did possess original records for the Illinois citation.  As for SpeedGauge, Marten

27

certainly could have made this case easier on itself had it retained those records, but their absence does not raise a genuine dispute regarding the reasonableness of the investigation.  To the contrary, Konsela was ready to delete the SpeedGauge-prompted HRIS entry if she could not confirm it, and so she reached out to another information source, Sobotta, who was responsible for the HRIS entry in the first place.  Other than his already-rejected claims about the alleged general inaccuracy of Marten's records, Maiteki provides no reason why Konsela could not reasonably rely on Sobotta's recollection of her own HRIS entry.  Consequently, the completeness of Marten's reinvestigation raises no question needing resolution by a jury.

f.   *Driver Qualification File*

Argument 15 invokes 49 C.F.R. § 391.51, requiring each motor carrier to "maintain a driver qualification file" which "must include" various items, such as the driver's employment application, a copy of the driver's road test, and the medical certificate attesting that the driver is fit to drive.  *Id.* § 391.51(a)–(b).  Maiteki claims that Marten's file on him "was perfunctory and legally incompetent [such] that it was virtually impossible to conduct a reasonable inquiry into his dispute."  (ECF No. 229 at 33.)

Marten disputes that its driver qualification file is legally deficient (ECF No. 236 at 5, ¶ 22), but that dispute is immaterial because Maiteki has not explained how it would change the outcome here.  Maiteki asserts that "Marten's employees never looked at [his] medical examiners certificate, certificate of driver's road test, [his] application for employment, [or] a note relating to the annual review of [his] driving record."  (ECF No. 229 at 33.)  Maiteki fails to explain the relevance of any of these documents to the question of whether he in fact was speeding as the HRIS entry

28

indicated.  Consequently, Marten's maintenance of or reference to Maiteki's driver qualification file raises no genuine factual dispute about the reasonableness of its reinvestigation.

g.     *Failure to Inform HireRight About Purge of SpeedGauge Data*

Argument 19 claims that Marten failed to "report the results of the investigation to the consumer reporting agency," 15 U.S.C. § 1681s-2(b)(1)(C), because it "failed to report the fact that [it] could not find the alleged underlying speeding data on Maiteki." (ECF No. 229 at 34.)  Maiteki's only supporting legal authority is *Boggio v. USAA Federal Savings Bank*, 696 F.3d 611, 617 (6th Cir. 2012), where the Sixth Circuit generically described the § 1681s-2(b)(1)(C) requirements as follows:

> After conducting its reasonable investigation and reviewing all relevant information provided by a CRA, a furnisher must report back its findings about a customer's information to the CRA that originally provided notice of the dispute. . . . [T]his reporting duty requires a furnisher to respond to a CRA regarding the results of the furnisher's investigation, irrespective of the outcome of its investigation.

This passage does not require a furnisher to explain all the records it could and could not find.  Circumstances may exist when this sort of information might be necessary for the credit reporting agency to accurately convey the results of the reinvestigation back to the consumer.  Maiteki, however, has not explained how this case fits into that category.  Thus, there is no genuine dispute to send to a jury.

h.     *Failure to Modify, Delete, or Block Information*

Argument 20 claims that Marten failed in its duty under 15 U.S.C. § 1681s-2(b)(1)(E) to modify, delete, or block inaccurate or unverifiable information. (ECF No. 229 at 34–35.)  This begs the question.  Marten did not find its information

inaccurate or unverifiable, and therefore had no such duty.

3.      Disposition

Maiteki's numerous arguments fail to raise a genuine issue of material fact.

Summary judgment will be granted to Marten on Maiteki's FCRA claim.  Given that the

Court reaches this disposition without reliance on the alleged untimely disclosed

evidence that Maiteki attacks in his Motion to Strike (ECF No. 239), that motion is

denied as moot.

**B.      Claim 8: Defamation**

Maiteki claims that Marten's original report of an "Unsatisfactory Safety Record"

to HireRight defamed him and caused him to lose job opportunities.  (ECF No. 157 at

36, ¶¶ 186–87.)  However, FCRA preempts "any action or proceeding in the nature of

defamation, invasion of privacy, or negligence with respect to the reporting of

information against . . . any person who furnishes information to a consumer reporting

agency . . . except as to false information furnished with malice or willful intent to injure

such consumer."  15 U.S.C. § 1681h(e).[9]  Marten argues that Maiteki cannot establish

malice or willful intent.  (ECF No. 220 at 18–19.)  The Court agrees and therefore need

not address Marten's alternative argument that its statements were true.  (*Id.* at 19–22.)

Courts evaluating malice in this context have borrowed the Supreme Court's

definition of "actual malice" in *New York Times v. Sullivan*, 376 U.S. 254, 279–80

(1964).  *See, e.g.*, *Greenwood Trust Co. v. Conley*, 938 P.2d 1141, 1149 (Colo. 1997)

(adopting *New York Times* standard).  Thus, "malice" requires "knowledge that a

---

[9] This provision contains exceptions other than for malice or willful intent, but Maiteki
does not argue that those exceptions apply here.

statement is false or reckless disregard for whether a statement is false or not." *Id.* at 1149.

Assuming *arguendo* that Marten's original report to HireRight regarding Maiteki was false, Maiteki has presented no evidence from which a jury could reasonably infer that Marten knew that it was false.  Indeed, Maiteki does not argue that Marten actually knew the report was false.

As for "reckless disregard," that phrase has been defined as requiring "a high degree of awareness of probable falsity" or at least entertaining "serious doubts as to the truth of [the] publication."  *Beuster v. Equifax Info. Servs.*, 435 F. Supp. 2d 471, 477 (D. Md. 2006) (internal quotation marks omitted).  Again, Maiteki has raised no triable issue of fact.

Some of his arguments in this regard go back to Marten's reinvestigation procedures and results (*see* ECF No. 229 at 36–37), which are not relevant to reckless disregard at the time of the original report to HireRight.  In terms of potentially relevant evidence, Maiteki claims that Marten furnished its report "without even reviewing his work record." (*Id.*)  In support, however, Maiteki cites only his own deposition, where he speculates that Marten could not have reviewed his entire file because he resigned on December 1, 2011 (a Thursday) and the HireRight report indicates that HireRight received information on Maiteki on December 5, 2011 (the following Monday).  (ECF No. 232-4 at 14; *see also* ECF No. 230-9 at 8.)  Maiteki believes that this timeframe was somehow too short, considering the intervening weekend.

It is undisputed, however, that Marten's contract with HireRight requires reporting

on a driver within one business day after the driver's termination or resignation.  (ECF No. 220 at 8, ¶ 19.)  In any event, even viewed in the light most favorable to Maiteki, his speculation is not enough to raise a triable issue of fact.  No reasonable jury could infer that Maiteki's nine-month employment with Marten generated a personnel file so large that it would require several days to review.

Maiteki's only other specific evidence of potential recklessness has to do with Drive-A-Check termination codes, which are numeric codes specified by HireRight that categorize the reason for a driver's termination.  (ECF No. 229 at 38.)  Apparently up until September 2011, Marten often used more than one termination code to describe the same conduct.  For example, if an employee was terminated for failure to keep proper logs, Marten would report termination code 926 (regarding improper log-keeping) and termination code 935 (generic company policy violation).  (*See* ECF No. 230-2.) On September 21, 2011, however, Marten human resources manager Jaclynn Peterson e-mailed various Marten HR employees and instructed them to discontinue this practice because HireRight "believe[d] . . . [Marten was] essentially 'double dinging' the driver." (*Id.*)  Thus, HR employees should only use code 935 when no more-specific code was available.  (*Id.*)  Peterson provided the following as an example: "In the past we used to use 935/938 for an accident term.  Now we will use 938 only."  (*Id.*)

From this, Maiteki constructs a chain of inferences.  First, he assumes that code 938 must refer exclusively to accident-related terminations.  Maiteki then correlates this with Marten's March 22, 2012 response letter to HireRight, which concludes by stating, "Work Record (938) Unsatisfactory Safety Record is accurate."  (ECF No. 220-12.) Maiteki therefore infers that Marten used code 938 when reporting Maiteki's termination

to HireRight, which would have been inaccurate because he had no accidents while at Marten.  (ECF No. 229 at 8, ¶ 21.)  This, says Maiteki, is evidence of reckless falsehood.

This argument is somewhat confusing because Maiteki's Drive-A-Check report nowhere contains a reference to code 938, nor does it say that Maiteki was terminated because of an accident.  Rather, the "Reason for Leaving" line says "Resigned/Quit or Driver Terminated Lease."  (ECF No. 230-9 at 8.)  Thus, assuming *arguendo* that Marten used an inaccurate termination code, Maiteki does not show any connection to the defamation he allegedly suffered.

Moreover, the assumption that Marten used an inaccurate termination code lacks evidentiary support.  Maiteki's *only* evidence in this regard is Peterson's e-mail in which she uses code 938 as an example of the single code to use when a driver is terminated based on an accident.  Peterson's e-mail does not establish that code 938 refers exclusively to accidents.  In fact, HireRight defines code 938 as "Unsatisfactory Safety Records: Driver did not meet company safety standards."  (ECF No. 236-8 at 2.)

For all these reasons, the Court finds no genuine dispute over any fact from which a reasonable jury could conclude that Marten furnished information recklessly (and therefore maliciously).[10]  Summary judgment is appropriate on Maiteki's defamation claim.  Moreover, because the parties have stipulated to dismiss all of

---

[10] FCRA allows a defamation claim where the plaintiff can prove "malice *or* willful intent to injure such consumer."  15 U.S.C. § 1681h(e) (emphasis added).  Maiteki notes that this phrase is "disjunctive" (ECF No. 229 at 35) but provides no standards for judging "willful intent," nor does he present evidence of such intent other than the same evidence on which he bases his claim of recklessness.  The Court therefore finds no triable issue of fact regarding willful intent.

Maiteki's causes of action against Marten other than his FCRA reinvestigation claim and his defamation claim (ECF No. 212), final judgment in favor of Marten is appropriate and will be entered at the close of the case.

## III.  FACTS: VOYAGER

### A.  Maiteki's Application to Voyager

The parties agree that Maiteki unsuccessfully applied to be a truck driver with Voyager in July 2012.  (ECF No. 221 at 2, 4, ¶¶ 1, 14; ECF No 231 at 2, ¶ 1; *see also* ECF No. 157 at 14, ¶¶ 72–75.)  Maiteki claims, and Voyager does not specifically contest, that he applied in person (*i.e.*, by handing a written application to a Voyager employee) rather than through the mail or online.  (ECF No. 231 at 2–3, ¶ 2(a).)[11]

Voyager has placed in the record a July 19, 2012 employment application appearing to be from Maiteki.  (ECF No. 222-2 at 34–37.)  Maiteki, however, denies that the application is actually his because "Voyager Express, in response to a federal subpoena, stated under oath that Plaintiff's application had been, 'purged and destroyed after one year from the date of his application.'" (ECF No. 231 at 2, ¶ 1.)  Thus, from the outset, the Court must evaluate a bizarre factual dispute to determine if it raises a genuine issue for trial.

This dispute begins before Maiteki sued Voyager.  Maiteki subpoenaed Voyager in May 2014, requesting Maiteki's employment application (presumably in hopes of proving that Maiteki had indeed been denied job opportunities based on Drive-A-Check information furnished by the other defendants).  (*See* ECF No. 233-1.)  By letter dated

---

[11] This detail matters for Maiteki's FCRA claim.  (*See* Part IV.A, *infra*.)

May 27, 2014, Voyager informed Maiteki's counsel that "we have no information to provide.  Voyager Express destroys all applications one year from the application date if the individual is not hired. . . .  As Mr. Maiteki was not hired[,] his file was purged and destroyed after one year from the date of his application."  (*Id.*)

Voyager subsequently discussed the subpoena with Angela Lindeen, who had been Voyager's Safety Manager and was the person who reviewed Maiteki's application in July 2012, but who was no longer employed by Voyager at the time of the subpoena. (*See* ECF No. 241-4 at 1; *see also* ECF No. 231 at 2–3, ¶ 2(a).)  Whatever Lindeen said, it prompted Voyager to realize that it had not destroyed Maiteki's application. (ECF No. 241-4 at 1.)  On August 12, 2014, Voyager's counsel turned over the application and related documents to Maiteki's counsel.  (*Id.* at 1–31.)

On July 11, 2014—in between Voyager's original and supplemental subpoena responses—Maiteki sued Voyager.  (*See Maiteki v. Voyager Express*, No. 14-cv-1939, ECF No. 1 (D. Colo., filed July 11, 2014).)  This Court subsequently consolidated that lawsuit into this one.  (ECF No. 153.)  Voyager and the other defendants then deposed Maiteki over two days in December 2014.  (*See* ECF No. 221-1 at 1, 6.)

On the first deposition day, counsel for HireRight handed deposition Exhibit 17 to Maiteki.  (*Id.* at 4.)  Deposition Exhibit 17 is identical to the first four pages of the Maiteki application materials that Voyager's counsel sent to Maiteki's counsel in August 2014. (*Compare* ECF No. 222-2 at 34–46 *with* ECF No. 241-4 at 2–5.)  Those first four pages consist of the main application itself, and were allegedly followed by additional disclosures and releases that Maiteki was required to sign (which the Court will address

shortly).  Regarding Exhibit 17, Maiteki testified as follows:

> Q.    . . . Is Document 17—is that the application you submitted to Voyager?
>
> A.    Yeah, this is the application.
>
> Q.    Okay.  And do you see on the first page it has, kind of in the middle of the page, a space for a signature?
>
> A.    Yeah.
>
> Q.    And is that your signature?
>
> A.    Yeah.

(ECF No. 222-1 at 4.)  This is the referenced signature:



(*Id.* at 34.)  The Court also notes how Maiteki printed his name at the top of the application, which will soon become important:

RONALD M. MAITEKI   Date of Application 07/19/12

(*Id.*)

On the second deposition day, Voyager's counsel handed deposition Exhibit 17 to Maiteki.  (*Id.* at 7.)  When asked several times whether he recognized Exhibit 17 from the previous day, Maiteki surprisingly testified, "I don't recall."  (*Id.*)

Voyager's counsel later introduced deposition Exhibit 53 (*see id.* at 15; *see also* ECF 241-5 at 4), which reproduces the first four pages of Exhibit 17, but also includes

three additional pages (*see* ECF No. 222-2 at 38–44).  One of those additional pages is

titled "FAIR CREDIT REPORTING ACT DISCLOSURE STATEMENT."  (*Id.* at 42.)  This

disclosure statement informs the applicant "that reports verifying your previous

employment, previous drug and alcohol test results, and your driving record may be

obtained on you for employment purposes."  (*Id.*)  Below the disclosure paragraph is the

following signature block:



(*Id.*)

  When asked if he recognized Exhibit 53, Maiteki answered,

> It looks like an application; but Voyager say[s] that they
> didn't have anything about me.  They never—they said they
> did not have any information about me, that I'd never done
> any—any business with them, and all the information I filled
> [*sic*; 'filed'?] with them was destroyed.  So I don't—I don't
> believe that this is true because they already admitted that
> they didn't have anything about me.

(ECF No. 241-5 at 4.)  Later, Maiteki and Voyager's counsel had the following

exchange:

> Q.   (BY MR. CONVERSE [Voyager's counsel]) Well,
> you've had an opportunity to look over the document
> that's been marked Deposition Exhibit 53.  There's
> handwriting throughout that deposition [*sic*].  Do you
> see that?

> A.   Yeah.

37

Q.      Do you recognize any of that handwriting anywhere
        on that document to be your own handwriting?

        MR. NYOMBI [Maiteki's counsel]: Objection for the
record.  Calls for speculation.

A.      I cannot admit because you say that I didn't have—
        that Voyager did not have any information about me.
        So I don't know where this one came from.

        MR. CONVERSE: Move to strike as nonresponsive.
Would you please read back the question[?]

        (The question was read back as follows: "Do you
recognize any of that handwriting anywhere on that
document to be your own handwriting?")

        MR. NYOMBI: Objection for the record; lacks
foundation.  Objection for the record; confusing.  Objection;
asked and answered.

A.      I don't know.

Q.      (BY MR. CONVERSE) Can you recognize your own
        handwriting, Mr. Maiteki?

        MR. NYOMBI: Objection.  Asked and answered.

A.      I don't know.  I don't know because I'm not an expert
        in analyzing handwritings.

Q.      (BY MR. CONVERSE) No, I'm not asking for an
        expert opinion.  I'm just asking you, are you capable
        of recognizing your own handwriting when you see it
        written on a piece of paper?

A.      I don't know.

Q.      Are you capable of recognizing your signature when
        you see it on a piece of paper?

        MR. NYOMBI: Objection.  Confusing.

A.      I don't know.

(*Id.* at 4–5.)[12]  The remainder of Maiteki's transcript contains similarly absurd attempts to avoid answering straightforward questions.  (*See* ECF No. 222-1 at 7–26; ECF No. 241-5 at 4–10.)

Returning to the question that prompted this long evidentiary excursion: is there a genuine dispute of material fact over the authenticity or genuineness of the document Voyager proffers as Maiteki's July 2012 employment application (including the FCRA disclosure page)?  The answer is no.  As to the first four pages, Maiteki affirmed to HireRight's counsel that it was his application—even though he stated the very next day that he did not know if he could recognize his own signature.  As to the FCRA disclosure page, no reasonable jury examining the handwriting and signatures throughout the application materials could conclude that the handwriting and signature on the FCRA page is not Maiteki's.

Accordingly, to the extent based on a continuing insistence that Maiteki's application to Voyager no longer exists, Maiteki's objections to Voyager's statement of material facts are rejected as unsupported.  (*See* ECF No. 231 at 2–8.)  Maiteki's answers on his second deposition day were not good faith denials, but unquestionably motivated by his desire to avoid admitting that he gave consent to have his Drive-A-Check report pulled (which is a crucial question in some of his causes of action, as discussed in Part IV, below).  The Court notes that if Maiteki's counsel coached Maiteki to respond as he did on the second deposition day, Maiteki's counsel should be subject

---

[12] The Court notes that Mr. Nyombi's objections are inappropriate, at times ridiculous, and an abuse of the right to object under Federal Rule of Civil Procedure 30(c)(2). Unfortunately, this is not an isolated lapse.  All of the Maiteki deposition excerpts submitted to the Court display the same pervasive abuse.

to bar discipline.  But the Court need not inquire that far.  Even if Maiteki developed

conveniently obstructive amnesia entirely on his own, Maiteki's counsel could not in

good faith rely on Maiteki's nonsensical insistence that his own application—which he

authenticated the day before—no longer exists because Voyager at one point

mistakenly asserted that it had been destroyed.

**B.     Lindeen's Contact With Maiteki on July 31, 2012**

The next major factual dispute arises from the events of July 31, 2012.

According to Lindeen, she spoke with Maiteki over the phone on that date to inform him

that he was not qualified for the available openings at Voyager.  (ECF No. 222-3 at 18;

ECF No. 222-4 at 22–23.)  Lindeen's daily work journal for July 31, 2012 also contains

an entry for "Ronald Maiteki 30 min."  (ECF No. 222-7 at 28.)  Lindeen claims that she

denied Maiteki's application because it was incomplete and contained inaccuracies,

and because Maiteki performed poorly during a personal interview.  (ECF No. 221 at 4,

¶ 14.)

At his deposition, Maiteki denied that anyone at Voyager had called him to tell

him that his application had been rejected.  (ECF No. 233-8 at 11.)  In support of that

denial, he claims he sent an e-mail to Lindeen on October 8, 2012, asking about the

status of his application—the inference being that he would not have needed to e-mail

Lindeen if she had already rejected him over two months earlier.  (ECF No. 231 at 12,

¶ 16.)

Maiteki does not attach that e-mail.  He instead attaches a May 20, 2014 letter

from one of his attorneys, Mr. Emejuru, to Voyager's custodian of records, encouraging

Voyager to respond to the then-pending subpoena.  (ECF No. 233-4.)  Apparently

because it would "enable [Voyager to] effectively respond to the subpoena" (*id.* at 1),

Mr. Emejuru pasted what he claimed to be the text of Maiteki's e-mail after his own

signature block, as follows:

Email sent by Plaintiff to Voyager Express Employee Angie Linden

From: Ronald Maiteki <ronmaiteki@gmail.com>
>>> Date: Mon, 8 Oct 2012 00:08:46 -0600
>>> Subject: Basis for employment placement.
>>> To: angie@shipvoyager.co
>>>
>>> Dear, madam,
>>> Im writing in regard to the application i submitted with your
>>> office
>>> around july 0f 2012, for a driver position.
>>> I happened to meet you and we talk about a range of issues regarding
>>> the
>>> basis for qualification and since
>>> then i have never got a chance to hear from you.I therefore would
>>> like you
>>> to let me know the basis of your decision
>>> as regards my situation to be employed at voyager express.
>>> I hope you promptly give me a response.
>>> Respectfully,
>>> Ronald Mukasa Maiteki.
>>

(*Id.* at 2.)  This appears to be Maiteki's only evidence of the e-mail.

Relying on such evidence raises serious concerns.  Assuming Maiteki intends to

introduce this at trial (as a prior consistent statement, for example), Mr. Emejuru would

probably need to take the stand to authenticate it, thus becoming a witness in his own

client's case.  Moreover, Voyager would almost certainly question Mr. Emejuru

regarding why he would ever cut and paste a portion of the e-mail into his letter rather

than producing a print-out of the original, and Mr. Emejuru would almost certainly refuse

to answer based on attorney-client privilege or work product protection, thus bogging

down the trial in thorny evidentiary questions.

41

But Voyager has thus far not made any such objections, so the Court need not address them yet.  Voyager instead points out that, by its terms, Maiteki addressed the e-mail to <angie@shipvoyager.co> whereas Voyager's actual domain name is <shipvoyager.com>.  (ECF No. 241 at 8, ¶ 16.)  Thus, says Voyager, Lindeen never received the e-mail.  (*Id.*)

Voyager's explanation makes sense, but the question in this context is not whether Voyager received the e-mail.  It is whether Maiteki sent it, or at least attempted to send it, because doing so is evidence from which a jury could conclude that Lindeen did not speak with Maiteki on July 31, 2012.  Mr. Emejuru's letter is potential evidence, however problematic, that Maiteki attempted to send the e-mail.

The Court accordingly finds a genuine dispute of fact regarding whether Lindeen actually spoke with Maiteki on July 31, 2012, or at least whether Lindeen told Maiteki on that date that his application had been rejected.  Whether this dispute is material to the outcome depends on the issues the Court turns to next.

C.    **Reliance on the Drive-A-Check Report**

The parties agree that on July 31, 2012, Lindeen at least requested Maiteki's Drive-A-Check report.  (*Compare* ECF No. 221 at 4, ¶ 11 *with* ECF No. 231 at 8, ¶ 11.) Lindeen claims that she did not receive Maiteki's Drive-A-Check report until the following day, by which time she had already decided not to hire Maiteki and told him as much.  (ECF No. 221 at 4, ¶¶ 12–15.)  Maiteki counters that Lindeen both requested and received the Drive-A-Check report on July 31, meaning that she may have considered the report as part of her decision.  (ECF No. 231 at 11, ¶ 15.)  As will be explained in Part IV.A.2, below, the timing matters because FCRA imposes certain

requirements on entities that intend to make an adverse decision based on what they learn in reports such as the Drive-A-Check, and Voyager admits it did not fulfill those requirements.  (ECF No. 231 at 12–13, ¶¶ 2–5.)

In support of his claim that Lindeen received the Drive-A-Check report on July 31, Maiteki cites to an "Inquiry History Report" showing a July 31 "Request Submitted" date for Maiteki's Drive-A-Check history, among other things.  (ECF No. 233-5.) Without more (*e.g.*, testimony about the length of time it takes for HireRight to fill orders), this is not evidence that Lindeen *received* the report on July 31.

However, Maiteki also points to certain of Voyager's written discovery responses. For example, Voyager responded "[a]dmitted" when asked to "[a]dmit that Voyager Express requested *and accessed* Plaintiff's . . . Drive-A-Check . . . report on July 31, 2012."  (ECF No. 233-2 at 3 (emphasis added).)  Furthermore, when asked to "[a]dmit that Voyager Express relied on Plaintiff's [Drive-A-Check] report provided by HireRight when determining Plaintiff's employment fate with Voyager Express," Voyager responded that it "admits [it] takes into consideration the contents of a [Drive-A-Check] report when determining whether to hire an applicant."  (*Id.*)

Voyager attempts to explain this through an affidavit from Stacy Lee, Voyager's vice president and chief financial officer, who "assisted in responding to" the requests for admission.  (ECF No. 241-2 ¶¶ 1, 6.)  Lee states that her assistance was "based upon [her] knowledge and belief at the time," but "facts which have been made known to [her] during the discovery process" have made her "aware that, despite [her] best efforts to accurately and fully respond . . . on behalf of Voyager, some of the Responses are either incomplete or incorrect."  (*Id.* ¶¶ 6, 7.)

Lee claims "no personal knowledge concerning Mr. Maiteki's application process with Voyager, including Ms. Lindeen's decision to deny Mr. Maiteki employment with Voyager." (*Id.* ¶ 12.)  Moreover, "Ms. Lindeen did not assist in compiling the Responses." (*Id.* ¶ 10.)  Instead, Lee based her "Responses concerning Mr. Maiteki's Application . . . upon Voyager's policies, procedures and ordinary course of conduct when screening applicants for over-the-road driver positions." (*Id.* ¶ 14.)

Considering all of the evidence, a reasonable jury could accept Lindeen's story (somewhat bolstered by her work journal) that she made her decision on July 31 before receiving Maiteki's Drive-A-Check report, and informed Maiteki of her decision the same day.  On the other hand, (i) a jury could conclude that Maiteki at least attempted to send an e-mail over two months later inquiring about his application status, suggesting that he had not heard from Lindeen earlier; (ii) Voyager received Maiteki's Drive-A-Check report at least by August 1; and (iii) Lee's affidavit establishes that consulting the Drive-A-Check report is part of Voyager's ordinary course of conduct when screening applicants. *See* Fed. R. Evid. 406 ("Evidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice.").  Taking all of this together, a reasonable jury could conclude that Lindeen made her decision sometime after receiving, and in part based on, the Drive-A-Check report.  Consequently, a genuine dispute exists regarding the material fact of when and on what basis Voyager decided to reject Maiteki's employment application.

## IV.  ANALYSIS: VOYAGER

**A.      FCRA (Claims 10 & 11)**

Maiteki contends that Voyager's alleged conduct violated two FCRA provisions.

The Court will discuss each in turn.

### 1.      Authorization to Obtain Consumer Report (15 U.S.C. § 1681b(b)(2)(A))

FCRA provides that, when an applicant applies in person for a job, the

prospective employer

> may not procure a consumer report, or cause a consumer
> report to be procured, for employment purposes with respect
> to any consumer, unless—
>
>        (i) a clear and conspicuous disclosure has been made
> in writing to the [applicant] at any time before the report is
> procured or caused to be procured, in a document that
> consists solely of the disclosure, that a consumer report may
> be obtained for employment purposes; and
>
>        (ii) the [applicant] has authorized in writing (which
> authorization may be made on the document referred to in
> clause (i)) the procurement of the report by that [prospective
> employer].

15 U.S.C. § 1681b(b)(2)(A).  No reasonable jury could conclude that Voyager's FCRA

disclosure statement was anything other than "clear and conspicuous," or that it failed

to inform that a consumer report would be obtained for employment purposes.  (*See*

ECF No. 222-2 at 42.)  In addition, as determined in Part III.A, above, no reasonable

jury could conclude that Voyager failed to give this disclosure to Maiteki or that he failed

to sign it.  The Court will therefore grant summary judgment on Maiteki's Claims 10 and

11 to the extent Maiteki alleges a violation of 15 U.S.C. § 1681b(b)(2)(A).

2.      Proper Notice Before Adverse Actions (15 U.S.C. § 1681b(b)(3)(A))

FCRA further provides that, when an applicant applies in person for a job, the prospective employer must,

> before taking any adverse action based in whole or in part on the report, . . . provide to the [applicant] to whom the report relates—
>
> (i) a copy of the report; and
>
> (ii) a description in writing of the rights of the consumer under this subchapter, as prescribed by . . . section 1681g(c)(3) of this title.

15 U.S.C. § 1681b(b)(3)(A).  Maiteki claims, and Voyager does not contest, that FCRA also requires additional notices after the adverse action has been taken.  *See* 15 U.S.C. § 1681m.

Voyager admits that it never sent any of these notices.  (ECF No. 231 at 12–13, ¶¶ 2–5.)  Voyager maintains it never had a duty to send such notices because Lindeen made her decision not to hire Maiteki before she saw his Drive-A-Check report.  (ECF No. 221 at 6–7.)  The Court has already concluded that a reasonable jury could conclude otherwise.  (*See* Part III.C, *supra*.)  Voyager offers no argument that it could somehow be excused from the notice requirements even assuming that Lindeen relied on the Drive-A-Check report when making her decision.  Accordingly, summary judgment must be denied on Maiteki's Claims 10 and 11 to the extent Maiteki alleges a violation of 15 U.S.C. § 1681b(b)(3)(A).

**B.      Invasion of Privacy (Claim 12)**

Maiteki's invasion of privacy claim rests on the allegation that Voyager "illegally accessed his Drive-A-Check report surreptitiously without his knowledge."  (ECF No.

157 at 44, ¶ 7.)  Again, however, no reasonable jury could conclude other than that Maiteki gave his written consent for Voyager to access his Drive-A-Check report.  The Court will grant summary judgment to Voyager on Maiteki's Claim 12.

**C.    Negligent Hiring & Supervision (Claim 13)**

Maiteki claims that Voyager was negligent in hiring and supervising Lindeen, thereby leading to the alleged FCRA violation.  (ECF No. 157 at 45.)  "Negligent *hiring* cases . . . involve the employer's responsibility for the dangerous propensities of the employee, which were known or should have been known by the employer at the time of hiring, gauged in relation to the duties of the job for which the employer hires the employee."  *Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1016 (Colo. 2006) (emphasis added).  And, "in a claim for negligent *supervision* against an employer the plaintiff must prove that the defendant knew his employee posed a risk of harm to the plaintiff and that the harm that occurred was a foreseeable manifestation of that risk."  *Keller v. Koca*, 111 P.3d 445, 446 (Colo. 2005) (emphasis added).  Thus, both negligent hiring and negligent supervision are closely tied to the employer's knowledge of the specific employee's potentially dangerous propensities.

Assuming Lindeen decided not to hire Maiteki based in part on his Drive-A-Check report, Maiteki has offered no evidence that Voyager had any knowledge or reason to know, either at the time of hiring or later, that Lindeen might have a propensity to fail to provide the required FCRA notices.  Maiteki claims that Voyager had insufficient policies, procedures, and training to ensure FCRA compliance, but Maiteki points to no authority converting such alleged corporate laxity into a claim of

negligently hiring or supervising a specific employee.  (ECF No. 231 at 28–32.)  Thus, summary judgment in Voyager's favor on Claim 13 is appropriate.  *Cf. Showler v. Harper's Magazine Found.*, 222 F. App'x 755, 766 (10th Cir. 2007) (summary judgment was appropriate on Oklahoma negligent supervision claim where plaintiffs failed to "point to any evidence of prior knowledge by [the employer] of any propensity by [the employee] to commit any of the torts alleged").

### D.      Intentional Infliction of Emotional Distress (Claim 14)

Finally, Maiteki claims that Voyager engaged in "outrageous conduct" by failing to give the required FCRA notices.  (ECF No. 157 at 46; ECF No 231 at 33–36.)  This Court has previously noted the elements of intentional infliction of emotional distress ("IIED") under Colorado law: "(1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff to suffer severe emotional distress."  *Maiteki*, 4 F. Supp. 3d at 1256 (quoting *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 966–67 (Colo. Ct. App. 2009)).  The Court has further noted that "the level of outrageousness required to create liability is extremely high."  *Id.* (quoting *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. Ct. App. 2003)).  Finally, this Court previously held that "alleg[ations] [of] knowingly and repeatedly report[ing] false information to HireRight . . . fall far short of meeting the exacting standard required to state a claim for [IIED]."  *Id.*  Maiteki's IIED theory against Voyager is even less compelling than that.  It therefore fails as a matter of law, and summary judgment will be granted for Voyager on Maiteki's Claim 14.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Marten's Motion for Summary Judgment (ECF No. 220) is GRANTED;

2.   Voyager's Motion for Summary Judgment (ECF No. 221) is GRANTED as to
     Maiteki's Claims 12, 13, and 14, and as to Claims 10 and 11 to the extent they
     allege a violation of 15 U.S.C. § 1681b(b)(2)(A), but DENIED as to Claims 10
     and 11 to the extent they allege a violation of 15 U.S.C. § 1681b(b)(3)(A);

3.   Maiteki's Motion to Strike or for Leave to File a Surreply (ECF No. 239) is
     DENIED AS MOOT;

4.   As between Maiteki and Voyager, this matter REMAINS SET for a jury trial
     beginning on March 7, 2016, with a Final Trial Preparation Conference on
     February 19, 2016 at 2:00 p.m. in Courtroom A801—however, given the limited
     portion of this case that remains for trial, the Court *sua sponte* SHORTENS the
     trial setting from five days to three days; and

5.   Further considering the limited portion of this case that remains for trial, Maiteki
     and Voyager are strongly encouraged to consider moving this Court for approval
     of a settlement conference to be scheduled before the assigned Magistrate
     Judge.

Dated this 15th day of October, 2015.

BY THE COURT:

William J. Martinez
United States District Judge